# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>STELLA MARION REEVES,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil No. 21-1674-BAH</td></tr>
<tr><td>DIMENSIONS HEALTH CORPORATION<br>d/b/a<br>UNIVERSITY OF MARYLAND CAPITAL<br>REGION HEALTH,</td><td>*<br>*<br>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Pro se Plaintiff Stella Marion Reeves ("Plaintiff") brought suit against her former employer, Dimensions Health Corporation doing business as University of Maryland Capital Region Health ("Defendant"), in the Circuit Court of Maryland for Prince George's County, alleging disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). ECF 2. Defendant removed the case to this Court. ECF 1. Though Plaintiff is currently pro se before this Count, she was represented by counsel for a brief period, during which she amended her complaint. ECF 20; *see also* ECF 53 (granting motion to withdraw as counsel). Pending before the Court are Defendant's motion for summary judgment, ECF 62, and Plaintiff's motion to file a surreply, ECF 70. Both motions are fully briefed. [1]  *See* ECFs 62, 66, 67, 68, 70, 71. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons that follow, Defendant's

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

motion for summary judgment, ECF 62, is **GRANTED**, and Plaintiff's motion to file a surreply, ECF 70, is **DENIED**.

## I.     <u>BACKGROUND</u>

In April 2018, Defendant hired Plaintiff as a Unit Secretary for the Operating Room at Defendant's hospital in Prince George's County, Maryland.  ECF 62-4, at 105 (showing position description with Plaintiff's signature and date of April 17, 2018).  When Plaintiff was hired, she disclosed to Human Resources staff ("HR") that she had recently been in a car accident and had suffered head trauma which left her with limited short-term memory problems as well as "traumatic vertigo."  ECF 62-4, at 13, 46:4–47:22; *id.* at 17, 64:1–6 ("I submitted [a doctor's note] to Ms. Peace [at HR], which, yeah, Ms. Peace knew everything. . . .  She knew about the head trauma, the concussion, the vertigo.").  HR assured Plaintiff that her medical issues would be accommodated, *id.* at 13, 47:21–22, and Plaintiff began a 90-day probationary period of employment with Defendant on May 1, 2018, which was Defendant's standard practice for new employees, ECF 66, at 3 ¶ 6 (explaining that the 90-day probationary period is standard practice for Defendant); ECF 62-4, at 12, 44:5–7 (stating that Plaintiff's employment began May 1, 2018).

On Plaintiff's first day of employment with Defendant, she had an "introduction of meeting" with the "department heads" with whom Plaintiff would be working.  ECF 62-4, at 16, 59:7–12.  At the introduction meeting, one of Plaintiff's supervisors, Schallery Colbert, told Plaintiff that "she had spoken with" HR and "knew about . . . the accident [Plaintiff] had been in" and assured Plaintiff that Defendant "ha[d]  no  problem . . . accommodating . . . [Plaintiff's] medical needs."  *Id.* at 16, 59:14–60:3.  Also present at the introduction meeting were Sheila George and Tamela Nichols, both of whom held supervisory positions, and Lystra Caruth, who was the "lead Nurse in training."  *Id.* at 16, 60:4–7; *id.* at 117.

Plaintiff quickly ran into difficulties with the nurse assigned to train her, Ms. Caruth.  *See* ECF 62-4, at 23, 87:5–88:12 (describing some of Plaintiff's concerns over Ms. Caruth's training of Plaintiff); *id.* at 25, 94:6–18 (describing complaints about Ms. Caruth's treatment of Plaintiff). In June 2018, Plaintiff began documenting her experiences with Ms. Caruth in letters she then gave to Ms. George, Ms. Colbert, and Ms. Nichols.  *Id.* at 25, 95:20–96:17.  Plaintiff's letters detailed "continual[]" "belligerent, insulting, and demeaning statements" made by Ms. Caruth towards Plaintiff.  *Id.* at 117.  These insults included calling Plaintiff "stupid," "dumb," "blind," "mentally challenged," "slow," and even "retarded." *Id.* at 117–19.  Ms. Caruth also told Plaintiff to "go back to the 'mental institution'" and referred to the "Mental Ward Area" of the hospital as Plaintiff's "home away from home."  *Id.* at 119–120 (capitalization adjusted).  Ms. Caruth made these comments both in private and in public, in front of staff and patients alike.  *Id.* at 119–21.

After delivering this first letter regarding Ms. Caruth's behavior, Plaintiff "continually spoke to [her supervisors] about it every day."  ECF 62-4, at 27, 104:12–13.  Ms. Colbert and Ms. Nichols "spoke to Ms. [Caruth] three or four times," but the abuse continued.  *Id.* at 28, 105:9–10. When Plaintiff "couldn't take it anymore," Ms. George encouraged Plaintiff to elevate her concerns beyond her supervisors.  *Id.* at 27–28, 104:18–105:4.  On July 13, 2018, Plaintiff submitted a letter outlining her ongoing complaints against Ms. Caruth to HR as well as her supervisors.  *Id.* at 124–28.  She submitted another letter of the same nature to HR on July 17, 2018. [2]  *Id.* at 129–31.

Though no other staff members were cruel to Plaintiff, Ms. Caruth was not Defendant's only staff member who was frustrated with Plaintiff's work performance.  Kimberly Person,

[2] The date on this letter originally read July 17, 2017, but Plaintiff described this as a mistake and stated that the year should have been 2018.  ECF 62-4, at 28, 107:22–108:3.

Plaintiff's coworker, complained of Plaintiff using overly affectionate terms to refer to staff, "including physicians, calling them 'honey,' 'sweetie,' or 'beautiful,'" and thought that Plaintiff was not a "good fit for the position." ECF 62-5, at 4–5. Ms. Colbert documented concerns over the same behavior on June 5, 2018. ECF 66, at 34. On June 15, 2018, Ms. Colbert recorded several additional concerns over Plaintiff's work performance, including the need to learn proper medical terminology and recognize and follow proper procedures. *Id.* She also noted that Plaintiff "has to be open to feedback and suggestion." *Id.*

Ultimately, in July 2018, Ms. Colbert recommended that Plaintiff's employment be terminated. ECF 66, at 36–38. In her memorandum recommending Plaintiff's termination, Ms. Colbert referenced that Plaintiff persisted in using inappropriately affectionate nicknames with colleagues, struggled to master medical terminology, and failed to follow proper procedure, despite being counseled on each of these issues. *Id.* The memo also outlined several specific errors Plaintiff made, as well as noting that she "fail[ed] to take accountability for mistakes." *Id.* Plaintiff was terminated as a Unit Secretary on July 18, 2018. *Id.*; *see also* ECF 62-4, at 133.

Plaintiff submitted a letter to HR on July 18, 2018, contesting Defendant's decision to terminate her employment. ECF 62-4, at 133–138. The only mention of Ms. Caruth's alleged behavior in this letter is in the form of a post-script referencing Plaintiff's former complaints and alluding to the possibility of the termination being retaliatory. *Id.* at 138 ("I was requested yesterday, by my manager . . . to submit my concerns and complaint in writing and today I was terminated?").

After her termination from the Unit Secretary role, Plaintiff was rehired by Defendant in August 2018, this time as a Patient Access Representative. ECF 62-4, at 140. This role differed substantially from the role of Unit Secretary and required more walking and standing while paying

less.  *Id.* at 31, 119:15–21.  Still, Plaintiff "needed a job," so she accepted it.  *Id.* at 32, 121:5.
Plaintiff began working as a Patient Access Representative on August 27, 2018, again on
probationary status for the first 90 days.  ECF 62-4, at 140–42.  Plaintiff initially got along very
well with her new supervisor, Debbie Guion.  ECF 62-4, at 36, 138:16–139:2.

Though Ms. Guion was friendly with Plaintiff, she documented repeated concerns with
Plaintiff's performance.  *See* ECF 62-6, at 3–4, ¶¶ 8–11.  Ms. Guion "discussed [Plaintiff's] work
deficiencies with her on September 14, September 19, September 21, September 27, and
September 28, 2018."  *Id.* at 4, ¶ 10, *id.* at 8–10.  Ms. Guion noted that Plaintiff repeatedly entered
patient information into the computer system incorrectly or failed to enter it altogether, that staff
complained of the way Plaintiff addressed them, and that the required "[s]kill set [was] not there."
*Id.* at 8–10.  On October 3, 2018, Ms. Guion recommended that Plaintiff's employment be
terminated because her performance did not improve, despite multiple conversations about her
mistakes.  *Id.* at 12.  Ms. Guion further noted that Plaintiff did "not take ownership of her errors"
and showed a "lack of attention to detail."  *Id.*

According to Plaintiff, her relationship with Ms. Guion soured abruptly a few days before
she was terminated.  ECF 62-4, at 38, 146:12–18. Plaintiff claims that Ms. Guion called Plaintiff
into her office and told Plaintiff that she had learned that Plaintiff had gotten Ms. Caruth, who was
Ms. Guion's good friend, fired.[3]  *Id.* at 38, 146:18–147:11.  After this conversation, Ms. Guion
was cold towards Plaintiff.  *Id.* at 38, 147:9–22 ("I mean, she would speak to a cat if the cat went
by. But she did not speak to me. She did not say good morning. She did not say hello. She didn't

---

[3] Ms. Guion denies that this meeting ever happened, and in fact claims that she did not know Ms.
Caruth at all, nor that Plaintiff had filed any prior complaints of discrimination with HR.  ECF 62-
6, at 4–5, ¶¶ 11–12.  However, given that all factual inferences must be taken in favor of Plaintiff,
the recitation of facts reflects Plaintiff's version of events.  *See Tolan v. Cotton*, 572 U.S. 650, 657
(2014) (per curiam).

say anything."). Only a "day or two" later, Plaintiff was terminated for the second time. ECF 62-4, at 38, 146:12–13.

## II.   <u>LEGAL STANDARD</u>

Because Plaintiff brings this suit pro se, the Court must liberally construe her filings, holding them to a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). This leniency has its limits, though. "A court may not construct the plaintiff's legal arguments for [her] . . . ." *Runge v. Barton*, Civ. No. 6:08-0231-GRA, 2009 WL 3245471, at *1 (D.S.C. Oct. 2, 2009), *aff'd*, 368 F. App'x 361 (4th Cir. 2010) (citing *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993)). And this leniency "does not relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007). This includes "questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Mag.*, 501 U.S.

6

496, 520 (1991) (citing *Anderson*, 477 U.S. at 255).  "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).  "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658–59 (4th Cir. 2020).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting the pre-2007 version of Fed. R. Civ. P. 56(e)).

## III.   <u>ANALYSIS</u>

The ADA prohibits employers from discriminating against otherwise "qualified individual[s] on the basis of disability."[4] 42 U.S.C. § 12112(a)–(b).  Among the forms of discrimination prohibited by the statute are retaliating against an employee for engaging in protected activities related to disability discrimination and creating a hostile work environment because of an employee's disability.  *See Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 653 (4th Cir. 2023) (recognizing each type of claim under the ADA).  Plaintiff alleges that Defendant engaged in both of the above forms of discrimination.  ECF 20, at 8–11, ¶¶ 37–55.

---

[4] Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that [the] individual holds or desires."  *Id.* § 12111(8).

"When a plaintiff alleges that her employer unlawfully discriminated or retaliated against her in violation of the ADA, she can prove her claim through direct and indirect evidence. Otherwise, the plaintiff may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (citing *Jacobs v. N.C. Admin. Off. of the Cts.,* 780 F.3d 562, 577 (4th Cir. 2015)).  Under the *McDonnell Douglas* framework, the plaintiff first bears the burden to establish a prima facie case for their claim.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003).  After the plaintiff establishes their prima facie case, the burden shifts to the defendant to rebut the inference of unlawful conduct by showing that there was a legitimate, non-discriminatory purpose for their actions.  *Id.*  The plaintiff, however, can still succeed on their claim if they are able to prove that the defendant's alleged legitimate purpose is pretextual.  *Jacobs*, 780 F.3d at 575–76 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

### A.    Motion to File a Surreply

Parties may not file a surreply (or a "sur-reply") without leave of the Court.[5]  Loc. R. 105.2(a).  "Though disfavored, surreplies 'may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply.'" *Pedersen v. Geschwind*, 141 F. Supp. 3d 405, 410 (D. Md. 2015) (quoting *Khoury v. Meserve,* 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd,* 85 Fed. App'x. 960 (4th Cir. 2004) (per curiam)).

Plaintiff's motion for leave to file a surreply identifies no matters presented for the first time in Defendant's reply, nor does it offer any other reason as to why Plaintiff could not have

---

[5] Replies are generally required to be filed within fourteen days after service of the opposition. Loc. R. 105.2(a).   Plaintiff's motion was filed more than three months after Defendant's reply in support of its motion for summary judgment.  *See* ECF 68 (showing that Defendant's reply was filed December 6, 2023); ECF 70 (showing that Plaintiff's motion for leave to file a surreply was filed March 22, 2024).

raised the arguments contained in the surreply in her original opposition.    *See* ECF 70, at 1 (identifying no valid reason justifying need for surreply); ECF 70-1, at 1–26 (same).  In fact, the arguments in Plaintiff's surreply appear to be largely duplicative of the arguments in her opposition. *See* ECF 70-1, at 1–26 (raising substantially the same arguments as raised in Plaintiff's original opposition).  As such, Plaintiff's motion for leave to file a surreply is denied.

### B.    Motion for Summary Judgment as to Count One: Hostile Work Environment

In order to succeed on a hostile work environment claim under the ADA, a plaintiff must show that "(1) [s]he is a qualified individual with a disability; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001).  Here, Plaintiff bases her claim for a hostile work environment entirely upon the actions of Ms. Caruth during her employment as a Unit Secretary. *See* ECF 20, at 8–9, ¶¶ 42–47.

The final element of this claim is determinative here.  An employer is not liable for a hostile work environment created by a plaintiff's coworker unless the employer "knew, or should have known, about the harassment and failed to take action reasonably calculated to stop it." *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020) (citing *Strothers v. City of Laurel,* 895 F.3d 317, 332–34 (4th Cir. 2018)); *see also Fox*, 247 F.3d at 176–77 (explaining that analysis of a hostile work environment under the ADA is analogous to an analysis of such a claim under Title VII). Here, Plaintiff was only employed as a Unit Secretary for a little over two months, and yet she states that both Ms. Nichols and Ms. Colbert met with Ms. Caruth "three or four times" to chastise her about her treatment of Plaintiff.  ECF 62-4, at 28, 105:9–10.  Ms. George, Plaintiff's other supervisor, encouraged her to report Ms. Caruth to HR.  *Id.* at 27–28, 104:18–105:4.  Ms. George

also met with Ms. Caruth twice about her treatment of Plaintiff.  ECF 66, at 45–47.  Despite the

fact that Plaintiff was terminated shortly after her complaining of Ms. Caruth's actions to HR, once

HR received Plaintiff's letter, an investigation was swiftly commenced into Ms. Caruth's behavior.

ECF 66, at 5.  Far from indicating that Defendant "failed to take prompt and adequate remedial

action," these facts paint a picture of an employer that was responsive to Plaintiff's complaints and

took seriously her allegations of discrimination.  As such, summary judgment will be granted in

favor of Defendant on Plaintiff's hostile work environment claim.  *See Lissick v. Andersen Corp.*,

996 F.3d 876, 885 (8th Cir. 2021) (finding that employer could not be held liable for hostile work

environment claim when supervisor "immediately investigated [the plaintiff's] complaints," "HR

immediately held a meeting" regarding proper workplace behavior, and offending coworkers were

disciplined).

Furthermore, it is likely that, even if Defendant could be held liable for Ms. Caruth's

behavior, the facts of this case would still not be sufficient to give rise to a finding of "severe or

pervasive" harassment.  The "severe or pervasive" standard is a rigorous one, and a plaintiff must

show both that they subjectively experienced the conditions as abusive and that the unwelcome

harassment was objectively severe or pervasive.  *E.E.O.C. v. Rite Aid Corp.*, 750 F. Supp. 2d 564,

572 (D. Md. 2010) (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)).

It cannot be disputed that Plaintiff found the alleged harassment to be *subjectively* severe or

pervasive, given the extensive efforts she expended to try to remedy it, including contacting her

supervisors and HR repeatedly, ECF 62-4, at 117–31, notifying the Human Relations Commission

of Prince George's County, ECF 62-7, at 2–6, and even filing this lawsuit, ECF 20, at 1–14.  The

question of whether the harassment was *objectively* severe or pervasive, however, is more difficult.

In considering whether the conduct was objectively severe or pervasive, "[a] court must weigh all the circumstances of the harassing conduct, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Rite Aid Corp.*, 750 F. Supp. 2d at 572 (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315). To constitute severe or pervasive harassment, the "employment atmosphere [must be] 'permeated with discriminatory intimidation, ridicule, and insult.'" *Id.* (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315). "[C]onduct that amounts to 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)'" does not rise to the level of severe or pervasive. *Id.* (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315).

Here, Plaintiff bases her claim for a hostile work environment exclusively on the "verbally abusive, offensive and discriminatory statements" directed at Plaintiff by Ms. Caruth. ECF 20, at 8–9, ¶ 42. Though this conduct, as reported, was certainly frequent, it was not physically threatening, and Plaintiff insists that she continued to perform her job perform her job quite well. ECF 62-4, at 25, 94:19–95:4 (explaining that Ms. Caruth's conduct was never physically threatening to Plaintiff); *id.* at 29, 111:11–112:8 ("I was good at my job. . . . [T]here were no mistakes."). Furthermore, courts across the country have made clear that name-calling, on its own, rarely gives rise to objectively "severe or pervasive" harassment. *See Peralta v. Roros 940, Inc.*, 72 F. Supp. 3d 385, 395 (E.D.N.Y. 2014) (finding that "name-calling," combined with "undue reprimands, perceived animosity, and unwelcome work assignments" did "not exhibit the severity or pervasiveness of an actionable hostile work environment"); *Murphy v. BeavEx, Inc.*, 544 F. Supp. 2d 139, 150–151 (D. Conn. 2008) (finding that name calling and teasing based on disability were not sufficient to show "severe or pervasive" harassment); *Rodriguez v. Loctite Puerto Rico,*

*Inc.*, 967 F. Supp. 653, 664 (D. P.R. 1997) (same).   Thus, considering the totality of the circumstances of Plaintiff's claim, Ms. Caruth's conduct likely did not give rise to a hostile work environment.

Accordingly, there is no genuine dispute of material fact with respect to Plaintiff's hostile work environment claim, and Defendant's motion for summary judgment is granted on this count.

**C.      Motion for Summary Judgment as to Count Two: Retaliation**

To succeed on a retaliation claim brought under the ADA, a plaintiff must show: "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird*, 978 F.3d at 892 n.4 (quoting *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006)).

"[P]rotected activity includes opposing any act or practice by the employer that violates the ADA and pursuing rights guaranteed by the statute[.]"  *LeBarron v. Interstate Grp., LLC*, 529 F. Supp. 3d 1163, 1173 (D. Nev. 2021) (citing *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004)); *see also* 42. U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.").  Filing an internal complaint alleging discrimination under the ADA is a protected activity.  *Staley v. Gruenberg*, 575 F. App'x 153, 154 (4th Cir. 2014) (per curiam).  An adverse employment action is one that adversely "affect[ed] employment or alter[ed] the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).  Termination is an adverse employment action.  42 U.S.C. § 12112(a) (prohibiting discrimination against qualified individuals on the basis of disability in certain employment actions, including the "discharge" of employees); *see also Hoyle v.*

*Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citing "firing" as an example of an adverse action).

Here, Plaintiff undeniably suffered an adverse employment action when she was terminated by Defendant not once, but twice. *See* ECF 66, at 36–38 (showing memorandum documenting Plaintiff's termination from her position as Unit Secretary); ECF 62-6, at 12–13 (showing memorandum documenting Plaintiff's termination from her position as Patient Access Representative). Plaintiff engaged in protected conduct when she complained to Defendant that Ms. Caruth was discriminating against her based on her disability. ECF 62-4, at 124–31 (showing Plaintiff's letters complaining about Ms. Caruth's behavior). The key question, then, is whether Plaintiff is able to show that there was a causal link between her protected conduct and her terminations.

Plaintiffs commonly point to a temporal connection to support an inference of a causal link between their protected activity and an adverse action, with shorter time periods giving rise to a stronger inference. *See Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485–86 (D. Md. 2015) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)) (collecting cases about temporal relationship between protected activity and adverse action). An inference of causation due to temporal proximity is undercut, though, by evidence that the employer was "contemplating" the adverse action "before it learned of" the protected activity. *Clark Cnty. Sch. Dist.,* 532 U.S. at 272. A plaintiff may also point to "the intervening period for other evidence of retaliatory animus" to "establish causation." *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007).

Here, it is undeniable that Plaintiff's first termination came immediately on the heels of her discrimination complaint to HR against Ms. Caruth. She sent her complaints documenting alleged discriminatory harassment by Ms. Caruth to HR on July 13 and July 17, 2018, and she was

13

terminated from her position as a Unit Secretary the very next day, on July 18, 2028.  ECF 62-4, at 124–31; ECF 66, at 36–38.  Such close temporal proximity would generally give rise to an inference of causation.  *Strothers*, 895 F.3d at 337 (finding that a plaintiff had established a prima facie case of retaliation when nine days had elapsed between protected activity and adverse action because "the lapse of one or even nine days is well-within what this Court has found to be a causally significant window of time").  This inference is defeated, though, by the ample evidence that Defendant had been dissatisfied with Plaintiff's performance in her Unit Secretary position nearly since her hiring.  *See e.g.*, ECF 66, at 34 (documenting Ms. Colbert's concerns over Plaintiff's performance); *see also Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." (citation omitted)).

Without the inference of causation that flows from the temporal connection, Plaintiff presents no additional evidence of causation between her complaint about Ms. Caruth's behavior and her termination from her role as Unit Secretary.  Defendant, however, provides ample evidence that this termination was motivated by Plaintiff's poor performance.  ECF 66, at 36–38 (showing memorandum recommending Plaintiff be terminated due to performance issues).  As such, Plaintiff has failed to state a prima facie case of retaliation with respect to her termination as Unit Secretary.

Plaintiff's termination from her role as a Unit Secretary is not the only instance of alleged retaliation upon which she rests her claim, however.  She also alleges that she was terminated from her second role with Defendant as a Patient Access Representative, after her supervisor, Ms. Guion, learned of her internal complaints against Ms. Caruth.  ECF 62-4, at 38, 146:12–147:22.  In her deposition, Plaintiff attested that Ms. Guion called her into her office just "a day or two"

before her second termination and told Plaintiff that she had become aware that Plaintiff was responsible for getting her good friend, Ms. Caruth, terminated. *Id.* Again, this presents a close temporal connection between when Ms. Guion learned of Plaintiff's protected activity and the adverse action Plaintiff suffered, supporting an inference of causation. But again, this inference is undercut by repeated evidence of Plaintiff's performance failures, documented extensively by Ms. Guion from the beginning of Plaintiff's tenure as a Patient Access Representative. *See* ECF 62-6, at 8–10. The Court will not infer causation from the temporal connection here.

Still, Plaintiff's allegation that Ms. Guion all but told her that she would be fired for what she had done to Ms. Guion's "friend" presents direct evidence of retaliatory animus. *See* ECF 62-4, at 38, 146:12–147:11; *see also Lettieri*, 478 F.3d at 650. But even if Plaintiff can establish a prima facie case for this second instance of alleged retaliation, Defendant points to ample evidence of legitimate, not retaliatory reasons for Plaintiff's termination. After a plaintiff proves a prima facie case of retaliation, "[t]he burden then shifts back to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Plaintiff's inadequate performance in her role as a Patient Access Representative was amply documented for months before her termination, long before Plaintiff suggests that Ms. Guion became aware of her prior complaint against Ms. Caruth and called Plaintiff into her office. *See* ECF 62-6, at 4, ¶10 (showing that Ms. Guion had regular conversations with Plaintiff regarding her performance deficiencies beginning on September 14, 2018). Moreover, Plaintiff presents no evidence that these long-standing complaints about her performance were pretextual and "unworthy of credence," especially given that they began before Ms. Guion allegedly even could have developed a retaliatory motive. *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 256 (1981). As such, Plaintiff's claim of retaliation

as it relates to her second termination must also fail.  Consequently, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

**IV.**     <u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff's motion for leave to file a surreply, ECF 70, is **DENIED**, and Defendant's motion for summary judgment, ECF 62, is **GRANTED**.   A separate implementing Order follows.

Dated: <u>June 28, 2024</u>                          <u>                /s/                </u>
                                                                        Brendan A. Hurson
                                                                        United States District Judge

16